UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

SIMIN SHAMSNIA AND                          CIVIL ACTION
MORTEZA SHAMSNIA

VERSUS                                      NO: 06-4429

LEXINGTON INSURANCE COMPANY                 SECTION: R(5)

## ORDER AND REASONS

Before the Court is plaintiffs' motion for partial summary judgment under Rule 56 of the Federal Rules of Civil Procedure. For the following reasons, the Court GRANTS plaintiffs' motion.

## I.    BACKGROUND

Hurricane Katrina damaged plaintiffs' home in Metairie, Louisiana. After the storm, plaintiffs filed claims for property damage under their homeowner's policy with their insurer, defendant Lexington Insurance Company. At the time of the storm, plaintiffs carried $894,500.00 in dwelling coverage on their house.[1] Lexington's adjuster calculated that it would cost

_____

[1] *See* Pls.' Mem. Supp. Ex. E, "Homeowner Declarations Page,"

$710,054.85 to repair the damage to plaintiffs' house.[2] After taking into account depreciation and the policy deductible, Lexington paid plaintiffs $603,853.49 based on a determination that the property was underinsured. In contrast, plaintiffs' adjuster calculated that plaintiffs suffered $1,391.509.20 worth of damages. Plaintiffs have brought claims for breach of contract and bad faith adjustment against Lexington.[3]

Plaintiffs' policy provides two different loss settlement schemes depending on whether plaintiffs insured their home for at least 80 percent of the full replacement cost value of the dwelling immediately before the loss. It provides, in relevant part:

    3.   Loss Settlement. Covered property losses are settled as follows:

        . . .

        b.   Buildings under Coverage A or B at replacement cost without deduction for depreciation, subject to the following:
           (1)  If, at the time of loss, the amount of

---

Jan. 24, 2005, R. Doc. 46-9.

   [2] *See* Pls.' Mem. Supp. Ex. I, "Settlement Statement," Mar. 23, 2006, R. Doc. 46-14 at 1; Def.'s Mem. Opp., R. Doc. 48 at 2.

   [3] Plaintiffs also allege that wind-caused damage rendered their home a total loss and have brought a claim under Louisiana's Valued Policy Law, La. Rev. Stat. § 22:695A. Their VPL claim is not at issue in this motion. Also, according to the report of Lexington's adjuster, plaintiffs' damages were the result of wind, a covered peril under their homeowner's policy.

insurance in this policy on the damaged
building is 80% or more of the full
replacement cost of the building immediately
before the loss, we will pay the cost to
repair or replace, after application of
deductible and without deduction for
depreciation, but not more than the least of
the following amounts:

   (a)  The limit of liability under this policy
       that applies to the building;

   (b)  The replacement cost of that part of the
       building damaged for like construction
       and use on the same premises; or

   (c)  The necessary amount actually spent to
       repair or replace the damaged building.

(2)  If, at the time of loss, the amount of
insurance in this policy on the damaged
building is less than 80% of the full
replacement cost of the building immediately
before the loss, we will pay the greater of
the following amounts, but not more than the
limit of the liability under this policy that
applies to the building:

   (a)  The actual cash value of that part of
       the building damaged; or

   (b)  That proportion of the cost to repair or
       replace, after application of deductible
       and without deduction for depreciation,
       that part of the building damaged, which
       the total amount of insurance in this
       policy on the damaged building bears to
       80% of the replacement cost of the
       building.

. . .

(4)  We will pay no more than the actual cash
value of the damage until actual repair or
replacement is complete. Once actual repair
or replacement is complete, we will settle
the loss according to the provisions of b.(1)

3

and b.(2) above.[4]

Lexington determined that plaintiffs had insured their home for less than 80 percent of the full replacement cost. Lexington's adjuster appraised the full replacement cost of plaintiffs' house at $1,738,905.03.[5] Plaintiffs' policy limit of $894,500.00 is only 51.4 percent of this figure. Lexington determined that plaintiffs would have to carry at least $1,391,124.00 in dwelling coverage to meet the 80 percent threshold. It then concluded that plaintiffs' losses should be settled under § 3(b)(2) of the policy's loss settlement conditions, which applies depreciation, not § 3(b)(1), which provides for the full cost of repairs without subtracting depreciation value.[6]

Plaintiffs now move for partial summary judgment on the issue of whether Lexington breached § 3(b)(1) of the loss settlement conditions by using a post-loss full replacement cost valuation to determine whether plaintiffs were underinsured. Plaintiffs contend that they had actually insured their home to

---

[4] Pls.' Mem. Supp. Ex. A, "Homeowner's Policy Section I-Conditions," R. Doc. 46-4 at 15.

[5] See Def.'s Mem. Opp. Ex. B, "Co-Insurance Calculation," R. Doc. 48-3 at 19.

[6] Def.'s Mem. Opp., R. Doc. 48 at 4.

4

its full value, after an inspection agency, at Lexington's
request, appraised the replacement cost of plaintiffs' property
at $894,500.00, only months before the storm.[7] In their Statement
of Uncontested Material Facts, plaintiffs state that Lexington
"compared post-loss replacement cost valuations to the policy
limits, instead of the replacement cost immediately before the
loss."[8] Lexington admits that it compared post-loss estimates to
plaintiffs' policy limits, but it argues that doing so is
immaterial to the question of whether it breached § 3(b)(1) of
the contract because plaintiffs have not completed repairs to
their house, which is required for Lexington to pay more than the
actual cash value of the damage.[9]

## II.  LEGAL STANDARDS

### A.   Applying Louisiana Law

Because jurisdiction is based on diversity, Louisiana law
applies to the substantive issues before the Court. *See Erie R.R.*

---

[7] *See* Pls.' Mem. Supp. Ex. B, "Declarations Page," Nov. 19,
2004, R. Doc. 46-6.; Pls.' Mem. Supp. Ex. C, "ASAP Inspection
Service Report," Dec. 15, 2004, R. Doc. 46-7; Pls. Mem. Supp. Ex.
D, Onebene Ltr. Jan. 3, 2005, R. Doc. 46-8.

[8] Pls.' Statement of Uncontested Material Facts at ¶ XVIII,
R. Doc. 46-3 at 4.

[9] *See* Def.'s Statement of Material Facts as to Which There
Is a Genuine Issue to Be Tried at ¶ XVIII, R. Doc. 48-4 at 3.

*Co. v. Tompkins*, 304 U.S. 64, 78 (1938). In Louisiana, the sources of law are legislation and custom. *Shaw Constructors v. ICF Kaiser Eng'rs, Inc.*, 395 F.3d 533, 546 (5th Cir. 2004). These authoritative or primary sources of law are to be "contrasted with persuasive or secondary sources of law, such as [Louisiana and other civil law] jurisprudence, doctrine, conventional usages, and equity, that may guide the court in reaching a decision in the absence of legislation and custom." *Id.* (quoting La. Civ. Code art. 1). In Louisiana, "courts must begin every legal analysis by examining primary sources of law: the State's Constitution, codes, and statutes." *Id.* (quoting *Prytania Park Hotel, Ltd. v. Gen. Star Indem. Co.*, 179 F.3d 169, 174 (5th Cir. 1999)). To make an "*Erie* guess" on an issue of Louisiana law, the Court must "employ the appropriate Louisiana methodology" to decide the issue the way that it believes the Supreme Court of Louisiana would decide it. *Id.* (quoting *Lake Charles Diesel, Inc. v. Gen. Motors Corp.*, 328 F.3d 192, 197 (5th Cir. 2003)).

### B.   Summary Judgment

Summary judgment is appropriate when there are no genuine issues as to any material facts, and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–323 (1986). A court

must be satisfied that no reasonable trier of fact could find for the nonmoving party or, in other words, "that the evidence favoring the nonmoving party is insufficient to enable a reasonable jury to return a verdict in her favor." *Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 178 (5th Cir. 1990) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). The moving party bears the burden of establishing that there are no genuine issues of material fact.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record contains insufficient proof concerning an essential element of the nonmoving party's claim. *See Celotex*, 477 U.S. at 325; *see also Lavespere*, 910 F.2d at 178. The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists. *See Celotex*, 477 U.S. at 324. The nonmovant may not rest upon the pleadings, but must identify specific facts that establish a genuine issue exists for trial. *See id.* at 325; *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1996).

## III. DISCUSSION

To determine whether Lexington violated the terms of the insurance policy, the Court must examine the insurance policy itself. Under Louisiana law, an insurance policy is a contract that constitutes the law between the parties, and it must be interpreted in accordance with the general rules of contract interpretation set forth in the Louisiana Civil Code. *See Peterson v. Schimek*, 729 So. 2d 1024, 1028 (La. 1999) (citing La. Civ. Code art. 1793; *Ledbetter v. Concord Gen. Corp.*, 665 So. 2d 1166, 1169 (La. 1996); *Crabtree v. State Farm Ins. Co.*, 632 So. 2d 736 (La. 1994)); *Pareti v. Sentry Indem. Co.*, 536 So. 2d 417, 420 (La. 1988). The extent of insurance coverage is determined by the parties' intent as reflected by words in the policy. *See* La. Civ. Code art. 2045; *Peterson*, 729 So. 2d at 1028 (citing *Ledbetter*, 665 So. 2d at 1169). If the policy wording is clear, and it expresses the intent of the parties, the agreement must be enforced as written. La. Civ. Code art. 2046; Pareti, 536 So. 2d at 420. The policy must be construed as a whole, and one portion should not be construed separately at the expense of disregarding another. *Pareti*, 536 So. 2d at 420. If an ambiguity exists, the ambiguity must be construed in favor of the party seeking coverage. *Id.* The Court may not alter the terms of the policy under the guise of contract interpretation when the language of

8

the policy is unambiguous. *Id.*

The terms of the settlement conditions are unambiguous. Section 3(b)(1) of the policy's loss settlement conditions states that "[i]f at the time of the loss, the amount of insurance in this policy on the damaged building is 80% or more of the full replacement cost of the building immediately before the loss," then Lexington will pay the cost of repairs "without deduction for depreciation." Thus, to determine whether plaintiffs are sufficiently insured for § 3(b)(1) to apply, plaintiffs' policy limit must be compared with the pre-loss full replacement cost of their home. In its Statement of Material Facts, Lexington admits that it compared a *post*-loss valuation to plaintiffs' policy limit. Based on that comparison, Lexington determined that plaintiffs had underinsured their property and consequently calculated plaintiffs' settlement amount under § 3(b)(2). Lexington further asserts that plaintiffs have not submitted competent evidence that Lexington used a post-loss figure or that they had indeed insured their house to 80 percent of its full, pre-loss replacement cost. In making these arguments, Lexington overlooks its admission that it used a post-loss figure to assess whether plaintiffs were underinsured. Lexington's admission is dispositive of the factual issue of whether it made a pre- or post-loss comparison. Notably, Lexington does not contend that

9

its adjuster's estimate is a pre-loss calculation. With respect to whether plaintiffs have demonstrated that they had sufficient insurance to obtain settlement under § 3(b)(1), plaintiffs have submitted an inspection report and correspondence connected with the appraisal of their house that took place on December 15, 2004, only months before the storm. The inspection report and the letter directing an increase in plaintiffs' policy limit dated January 3, 2005, state the replacement cost of plaintiffs' house was $894,500.00.[10] Plaintiffs subsequently insured their home for this amount. Lexington does not explain why this estimate is inaccurate or how the replacement cost of plaintiffs' house dramatically increased in fewer than nine months between the appraisal and the hurricane. Nor does Lexington provide any alternative pre-loss estimates.

The Court finds unpersuasive Lexington's argument that its using post-loss figures is immaterial because plaintiffs are required under § 3(b)(4) to complete repairs before receiving payment for anything more than actual cash value of their property damage. Reading the contract as a whole, Lexington might not be required to pay the full cost of repairs without deducting depreciation value until repairs are complete. But Lexington's

---

[10] *See* Pls.' Mem. Supp. Ex. C, "ASAP Inspection Service Report," Dec. 15, 2004, R. Doc. 46-7; Pls. Mem. Supp. Ex. D, Onebene Ltr. Jan. 3, 2005, R. Doc. 46-8.

10

use of post-loss estimates triggered its decision to calculate plaintiffs' settlement under § 3(b)(2), which provides a payment scheme different from that available under § 3(b)(1). Lexington does not contend that once plaintiffs complete repairs to their home, it will pay plaintiffs the depreciation value that it deducted in addition to the actual cash value payment that it has already made. Instead, based on its use of post-loss estimates, Lexington took the position that plaintiffs were entitled only to actual cash value under § 3(b)(2). Therefore, the use of a post-loss appraisal affected the terms of plaintiffs' settlement and was a breach of contract.

Lexington's argument that any breach of § 3(b)(1) is immaterial goes to any damages that plaintiffs might have suffered. Plaintiffs do not seek summary judgment on the issue of damages, and the Court does not make any finding on damages. The issue of whether Lexington is liable for breach of contract is separate from the issue of what damages plaintiffs should recover as a result of the breach. Courts frequently decide issues of liability for breach of contract and damages separately. *See, e.g., Atel Cash Distrib. Fund, V, L.P. v. Schwegmann Giant Super Markets*, No. 97-3205, 1998 WL 101697, at *3 (E.D. La. Mar. 4, 1998). A finding of damages is not necessary to determine whether Lexington breached the agreement, and the parties have not

11

addressed the question of damages. Lexington has confirmed, however, that it compared plaintiffs' policy limits to post-loss replacement estimates when it was supposed to use a pre-loss valuation. This comparison led to its decision to calculate plaintiffs' settlement under one provision instead of another. In light of Lexington's admission, no material issue of fact exists over whether Lexington improperly used a post-loss valuation in the process of calculating plaintiffs' settlement. Accordingly, plaintiffs are entitled to summary judgment on this issue.

## IV.   CONCLUSION

For the foregoing reasons, the Court GRANTS plaintiffs' motion.

New Orleans, Louisiana, this 29th day of November, 2007.

_____
SARAH S. VANCE
UNITED STATES DISTRICT JUDGE